IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–01890–EWN–BNB

JAMES H. LAYMAN,

      Plaintiff,

v.

CARLOS GUTIERREZ, Secretary,
United States Department of Commerce,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is an employment discrimination case.  Plaintiff James H. Layman asserts that his former employer Defendant United States Department of Commerce, National Oceanic and Atmospheric Association, Mountain Administrative Support Center, Human Resources Division discriminated against him on the basis of his sex, race, age, and/or disability as well as retaliated against him for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* (2006) ("Title VII"), the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 706, *et. seq.* (2006) ("Rehabilitation Act"), the Age Discrimination in Employment Act, 29 U.S.C. § 623 (a)(1)(2) (2006) ("ADEA"), and the Equal Access to Justice Act, 28 U.S.C. § 2412, *et. seq.* (2006) ("EAJA").  This matter comes before the court on

"Defendant's Motion for Partial Summary Judgment," filed May 30, 2006.  Jurisdiction is premised upon the existence of a federal question, 28 U.S.C. §§ 1331, 1367 (2006).

## FACTS

### 1.    *Factual Background*

Plaintiff is a Caucasian male, over the age of forty, who has partial paralysis and arthritis. (Compl. ¶¶ 12–15 [filed Sept. 29, 2005] [hereinafter "Compl."].)  At all times relevant hereto, Plaintiff was a federal civilian employee.  (Compl. ¶ 3.)  Plaintiff began working for the Department of Commerce in 1978 as a Human Resources Specialist.  (Def.'s Mot. for Partial Summ. J., Statement of Undisputed Facts ¶ 1 [filed May 30, 2006] [hereinafter "Def.'s Br."]; *admitted at* Resp. to Mot. for Partial Summ. J., Resp. to Statement of Undisputed Facts ¶ 1 [filed June 19, 2006] [hereinafter "Pl.'s Resp."].)

As of November 2001, Plaintiff was a Human Resources Advisor for Defendant.  (*Id.*, Statement of Undisputed Facts ¶ 2; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 2.)  In November 2001, Plaintiff applied for a promotion to one of two vacant team leader positions.  (*Id.*, Statement of Undisputed Facts ¶¶ 3, 5; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 3, 5.)  The interviews for the team leader position were conducted by three management officials: (1) Shirley Purcell, the Chief of the Human Resources Division; (2) Randy Quartemont, Plaintiff's team leader; and (3) Tedd Beegle, the Chief of the Operational Services Branch.  (*Id.*, Statement of Undisputed Facts ¶ 4; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 4.)

In March 1998, Plaintiff became eligible for retirement, but decided to continue working. (Pl.'s Resp., Statement of Add'l Disputed Facts ¶ 3; *admitted at* Def.'s Reply in Supp. of Motion for Partial Summ. J., Resp. Concerning Disputed Facts [hereinafter "Resp. to Add'l Disputed Facts"][1] [filed July 5, 2006] [hereinafter "Def.'s Reply"].)  In January 2002, Purcell informed Plaintiff that Linda Wamboldt and Anita Rakestraw, two other Human Resources Advisors, had been selected for the team leader positions.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 6, 7; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 6, 7.)  Starting in January 2002, Wamboldt became the team leader for Plaintiff's team.  (*Id.*, Statement of Undisputed Facts ¶ 8; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 8.)  At that time, Purcell was Plaintiff's second line supervisor and had no direct contact with Plaintiff regarding his work or performance.  (*Id.*, Statement of Undisputed Facts ¶ 12; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 12.)

### a.    *Plaintiff's EEO Complaint*

In February 2002, Plaintiff sent Wamboldt a short e-mail informing her that he was going to be talking to an Equal Employment Opportunity ("EEO") counselor.  (*Id.*, Statement of Undisputed Facts ¶ 9; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 9.)  In June 2002, Plaintiff filed an EEO complaint related to his nonselection for the team leader positions.  (*Id.*, Statement of Undisputed Facts ¶ 10; *admitted at* Pl.'s Resp., Resp. to Statement

---

[1]I do not cite to a specific paragraph of Defendant's Response to Additional Disputed Facts here, because Defendant, instead of admitting or denying each paragraph of Plaintiff's Additional Disputed Facts individually, chose instead to admit all facts except ¶¶ 12 and 13.  (*See* Def.'s Reply at 3.)

of Undisputed Facts ¶ 10.)  Plaintiff claimed that Purcell, Quartemont, and Beegle had

discriminated against him on the basis of age, race, sex, and disability.  (*Id.*, Statement of

Undisputed Facts ¶ 10; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 10.)  In

April or May 2004, Plaintiff informed Wamboldt that he would be attending a deposition relating

to his EEO complaint.  (Pl.'s Resp., Statement of Add'l Disputed Facts ¶ 7; *admitted at* Def.'s

Reply, Resp. to Statement of Add'l Disputed Facts.)  Between February 2002, when Plaintiff first

informed Wamboldt that he would be speaking with an EEO counselor, and May 2004, when

Plaintiff told her about his deposition, Wamboldt forgot about Plaintiff's EEO complaint.  (*Id.*,

Statement of Add'l Disputed Facts ¶ 7; *admitted at* Def.'s Reply, Resp. to Statement of Add'l

Disputed Facts.)

> **b.      *Plaintiff's Performance Evaluations by Wamboldt Prior to October 2004***

While Wamboldt was Plaintiff's team leader, Plaintiff received several performance

evaluations.  (Def.'s Br., Statement of Undisputed Facts ¶ 17; *admitted at* Pl.'s Resp., Resp. to

Statement of Undisputed Facts ¶ 17.)  Such evaluations were subject to a "pass-fail" system,

wherein performance could be categorized only as either "meets or exceeds" expectations or

"does not meet" expectations.  (*Id.*, Statement of Undisputed Facts ¶ 14; *admitted at* Pl.'s Resp.,

Resp. to Statement of Undisputed Facts ¶ 14.)   In 2002 and 2003, based on input from

Wamboldt, Plaintiff was consistently rated as meeting or exceeding expectations.  (*Id.*, Statement

of Undisputed Facts ¶ 17; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 17.)

Additionally, between January 2002, when Wamboldt became his team leader, and May 2004,

Wamboldt gave Plaintiff several performance awards.  (Pl.'s Resp., Statement of Add'l Disputed

Facts ¶ 15; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.)  On April 29, 2004, Plaintiff received his final award from Wamboldt, about which she wrote: "For the period of May 2003 through April 2004, [Plaintiff] has continued to provide excellent human resource service[,] . . . provides sound advice and guidance to managers and employees and serves as a valuable resource."  (*Id.*, Statement of Add'l Disputed Facts ¶ 16; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.)

  **c.**  ***Plaintiff's Post-May 2004 Performance***

  In January or February of 2004, Plaintiff was approached by John Gordon, a Meterologist in Charge for the National Weather Service ("NWS") office in Huntsville, Alabama and a manager with whom Plaintiff was assigned to work as a Human Resources Advisor.  (*Id.*, Statement of Undisputed Facts ¶ 19; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 19.)  Plaintiff and Gordon discussed the possibility of withholding a within-grade step increase for one of Gordon's employees (hereinafter "Employee K") about whom Gordon had some concerns.  (*Id.*, Statement of Undisputed Facts ¶ 20;  *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 20; *see also* Pl.'s Resp., Statement of Add'l Disputed Facts ¶ 2; *admitted at* Def.'s Reply, Resp. to Add'l Disputed Facts.)  To deny the within-grade increase, Employee K needed to have a negative performance rating; otherwise, the within-grade increase would happen automatically in early August 2004.  (Def.'s Br., Statement of Undisputed Facts ¶ 21; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 21.)  On or about July 10, 2004, Plaintiff sent to the NWS Office in Huntsville, Alabama a draft letter for review notifying Employee K that his within-grade increase would be withheld.  (*Id.*, Statement of Undisputed Facts ¶ 22; *admitted*

*at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 22.)  Some time later, Wamboldt spoke

with Plaintiff regarding perceived problems with the draft letter.  (*Id.*, Statement of Undisputed

Facts ¶ 23; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 2; Def.'s Br., Ex.

A–3 [Pl. Aff.].)  In July 2004, at the same time Plaintiff was consulting Gordon about withholding

Employee K's within-grade increase, Plaintiff also consulted Gordon about giving Employee K an

award.  (*Id.*, Statement of Undisputed Facts ¶ 24; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 24.)  Although Plaintiff saw no issue with both withholding Employee K's

within-grade increase and giving him an award, when Wamboldt learned of this possibility, she

disagreed with Plaintiff.  (*Id.*, Statement of Undisputed Facts ¶ 24; *admitted at* Pl.'s Resp., Resp.

to Statement of Undisputed Facts ¶ 24.)

On July 30, 2004, immediately prior to leaving on vacation for two weeks, Plaintiff

provided Wamboldt with a draft performance improvement plan ("PIP") for Employee K that

Gordon had prepared.  (*Id.*, Statement of Undisputed Facts ¶ 25, 28; *admitted at* Pl.'s Resp.,

Resp. to Statement of Undisputed Facts ¶ 25, 28; *see also* Def.'s Resp., Statement of Add'l

Disputed Facts ¶ 8; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.)  At

that point, the draft PIP was "incomplete, mostly written in the third person, [and] contained

information irrelevant to the employee's performance from the previous performance cycle in

which the employee was rated as satisfactory."  (Def.'s Br., Statement of Undisputed Facts ¶ 26;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 26.)  Plaintiff gave the draft

PIP to Wamboldt because he was having trouble getting essential information from Gordon and

he hoped Wamboldt would collaborate and share her thoughts on the issue.  (Pl.'s Resp.,

Statement of Add'l Disputed Facts ¶ 9; *admitted at* Def.'s Reply, Resp. Concerning Add'l

Disputed Facts.)  In August and October of 2004, Wamboldt discussed with Plaintiff some points

relating to the Employee K case.  (*Id.*, Statement of Undisputed Facts ¶ 29; *admitted at* Pl.'s

Resp., Resp. to Statement of Undisputed Facts ¶ 20.)

### d.      Plaintiff's October 2004 Performance Evaluation

On October 13, 2004, Plaintiff informed Wamboldt that he would be retiring on December

3, 2004.  (*Id.*, Statement of Undisputed Facts ¶ 32; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 32.)  Some of the reasons Plaintiff chose to retire were problems with the

Employee K case as well as Plaintiff's perception that Wamboldt was treating him poorly in

retaliation for filing his EEO complaint.  (*Id.*, Statement of Undisputed Facts ¶ 33; *admitted at*

Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 33; *see also* Pl.'s Resp., Statement of Add'l

Disputed Facts ¶ 4; *admitted at* Def.'s Reply, Resp. to Add'l Disputed Facts.) Even though

Plaintiff was retiring, Wamboldt was required to give Plaintiff a performance evaluation for the

period spanning from October 2003 through September 2004.  (Def.'s Br., Statement of

Undisputed Facts ¶ 36; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 36.)

On October 15, 2004, Plaintiff and Wamboldt discussed his performance evaluation for that

period.  (*Id.*, Statement of Undisputed Facts ¶ 37; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 37.)  Plaintiff received a positive rating, indicating that his overall

performance met or exceeded expectations.  (*Id.*, Statement of Undisputed Facts ¶ 38; *admitted*

*at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 38.)  However, Wamboldt attached four

and one half pages of written comments (the "Performance Comments") to Plaintiff's

performance evaluation, which primarily critiqued Plaintiff's handling of the Employee K case.

(Def.'s Br., Ex. A–4 at 22–26 [Performance Comments].)  The final paragraph of the

Performance Comments reads:

> This document is to communicate to you the serious concern I have about you
> meeting your performance expectations in the employee relations area of your job.
> Your inadequate performance in this area is not typical of your usual diligence to
> meeting your clients' needs and providing them with expert advice and guidance.
> During our meeting on October 13, 2004, I emphasized that we are a team.  If any
> of us need help with completing assignments, we need to let our back up and/or
> team leader know so we can arrange for the completion of work to meet our
> client's expectations.  I expect that you will continue to work together with me to
> get all your work assignments completed timely and accurately.

(*Id.*, Ex. A–4 at 26 [Performance Comments].)

The Performance Comments are the only negative comments in Plaintiff's Official

Performance File.  (Pl.'s Resp., Statement of Add'l Disputed Facts ¶ 10; *admitted at* Def.'s Reply,

Resp. to Statement of Add'l Disputed Facts.)  Purcell had approved attaching the comments to

Plaintiff's evaluation.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 46–47; *admitted at* Pl.'s

Resp., Resp. to Statement of Undisputed Facts ¶¶ 46–47.)  Neither Purcell nor Wamboldt had

ever taken such action against an employee.  (Pl.'s Resp., Statement of Add'l Disputed Facts ¶

11; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.)  Plaintiff was in fact

retired before the Performance Comments were actually placed in his permanent record.  (*Id.*,

Statement of Add'l Disputed Facts ¶ 14; *admitted at* Def.'s Reply, Resp. to Statement of Add'l

Disputed Facts.)  The Performance Comments did not affect Plaintiff's pay, benefits, or job

responsibilities in any way.  (Def.'s Br., Statement of Undisputed Facts ¶ 43; *admitted at* Pl.'s

Resp., Resp. to Statement of Undisputed Facts ¶ 43.)  Except for Plaintiff and Purcell, Wamboldt

has not shown the comments to anyone other than the attorneys in this case.  (*Id.*, Statement of Undisputed Facts ¶ 48; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 48.)

On October 15, 2004, the Monday after Plaintiff received his performance evaluation, he submitted his retirement papers and advanced his retirement date to October 20, 2004.  (*Id.*, Statement of Undisputed Facts ¶ 49–50; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 49–50.)  After Plaintiff retired, Wamboldt learned that Plaintiff was requesting to have the Performance Comments removed from his Official Personnel File, and she indicated she would be amenable to his request.[2]  (*Id.*, Statement of Undisputed Facts ¶ 52; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 52.)  Since Plaintiff's retirement, Wamboldt has not been contacted for an employment reference for Plaintiff and is not aware of anyone else having been contacted for such a reference.  (*Id.*, Statement of Undisputed Facts ¶ 55; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 55.)

## 2.    *Procedural History*

On September 29, 2005, Plaintiff filed a complaint in this court asserting that Defendant: (1) discriminated against Plaintiff on the basis of his sex, race, age, and/or disability in violation of Title VII, the Rehabilitation Act, the AEDA, and the EAJA; and (2) retaliated against Plaintiff in violation of Title VII.  (Compl. ¶¶ 30–44.)  On December 12, 2005, Defendant filed an answer. (Answer [filed Dec. 12, 2005].)

---

[2]There is some dispute as to whether Wamboldt has actually removed the Performance Comments. (*See id.*, Statement of Undisputed Facts ¶ 53; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 53.)

On May 30, 2006, Defendant filed a motion for partial summary judgment on Plaintiff's retaliation claim. (Def.'s Br.) Defendant argues that Plaintiff cannot maintain his claim because: (1) the Performance Comments were not an adverse employment action; and (2) there is no evidence of a causal connection between Plaintiff's protected activity and the Performance Comments. (*Id.* at 14–21.) On June 19, 2006, Plaintiff filed a response to Defendant's motion. (Pl.'s Resp.) On July 5, 2006, Defendant filed a reply in support of its motion. (Def.'s Reply.) On July 31, 2006, by leave of this court, Plaintiff filed a surreply to Defendant's reply. (Surreply to Def.'s Reply in Supp. of Mot. for Partial Summ. J. [filed July 31, 2006] [hereinafter "Pl.'s Surreply"].)

## ANALYSIS

### 1.   Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2006).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.     *Evaluation of Claims***

Defendant moves for summary judgment on Plaintiff's claim of unlawful retaliation under Title VII.  (Def.'s Br. at 14–21.)  "Title VII prohibits an employer from discriminating against an employee in retaliation for opposing unlawful employment practices." *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1263 (10th Cir. 1998) (citing 42 U.S.C. § 2000e–3[a]).  In analyzing claims for Title VII retaliation, courts apply the framework of shifting evidentiary burdens outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003).  As a threshold matter, under *McDonnell Douglas*, Plaintiff must establish a prima facie case of retaliation. *McCowan v. All Star Maint., Inc.*, 273 F.39 917, 922 (10th Cir. 2001).  The "burden of establishing a prima facie case" is "not onerous." *Id.* (citation and internal quotation marks omitted).  Establishment of a

*prima facie* case creates a rebuttable presumption of unlawful discrimination. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If Plaintiff establishes a prima facie case, the burden of production then shifts to Defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Wells*, 325 F.3d at 1212. If Defendant articulates a proper basis for its actions, the burden shifts back to Plaintiff to demonstrate that the reason advanced by Defendant is a pretext for unlawful discrimination. *Id.*

### i.      Prima Facie Case

To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that: (1) he participated in protected opposition to unlawful discrimination; (2) Defendant took "action that a reasonable employee would have found materially adverse;" and (3) there exists a causal connection between his protected opposition and Defendant's adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164 (10th Cir. 2006). An employee engages in a protected activity when the employee "has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation proceeding or hearing." 42 U.S.C. § 2000e–3(a) (2006). Defendant does not contest that Plaintiff's filing of an EEO complaint constitutes protected opposition. (*See* Def.'s Br. at 14.) Thus, the only issues before the court regarding the prima facie case are whether: (1) Defendant's actions were materially adverse; and (2) a causal connection exists between the protected opposition and Defendant's adverse action.

#### *(1)*       *Materially Adverse Action*

In Defendant's initial brief, it argues that to survive summary judgment, Plaintiff must show Defendant took action that was "'materially adverse to the employee's job status.'"  (Def.'s Br. at 14 [quoting *Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) (internal quotations omitted)].)  After Plaintiff filed his response, the Supreme Court issued its decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), holding that to prevail on a Title VII retaliation claim, a plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* at 2414–15.  In its reply, Defendant states "this new formulation from the Supreme Court . . . is not much different from the standard previously applied in the Tenth Circuit."  (Def.'s Reply. at 5–6.)  Plaintiff counters that the Supreme Court has unequivocally rejected this circuit's formulation of material adversity cognizable as retaliation. (Pl.'s Surreply at 5–6.)

Defendant is sorely misguided.  Recognizing a split among the circuits as to the scope of Title VII's anti-retaliation provision, the Supreme Court explicitly rejected the standard applied by those circuits that have treated the anti-retaliation provision as forbidding only conduct that affects an individual's employment status.  *See Burlington*, 126 S. Ct. at 2414–15.  The Tenth Circuit, which had required plaintiffs alleging retaliation to show their employer engaged in an "adverse employment action," was one of the circuits whose standard was rejected by the Supreme Court, as this circuit has now twice made definitively clear.  *See Metzler*, 464 F.3d at

-13-

1171 n.2 (noting "the Supreme Court recently rejected our 'adverse employment action' standard"); *Argo*, 452 F.3d at 1202 n.2 (same). Ultimately, "[i]nterpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of [Title VII's] primary objective depends," because "an employer can effectively retaliate against an employee by taking actions not directly related to his employment." *Burlington*, at 2412–14. With this understanding of the appropriate standard, I turn to the application of the standard to the facts of the instant case.

### *(a)      Disparate Treatment*

As a preliminary matter, Defendant contends that the court should limit itself to consideration of only the Performance Comments as an adverse action. (Def.'s Reply at 10–11.) Plaintiff argues that the adverse actions at issue include both the Performance Comments *and* disparate treatment by Wamboldt. (*See* Pl.'s Resp. at 11–14.) Specifically, Plaintiff claims that Wamboldt, after she became aware of his EEO complaint: (1) spoke with Plaintiff less; (2) took longer to review his work; and (3) became more critical of his work. (*See id.*) Although Defendant's argument is muddled, it appears that Defendant seeks to prohibit the court from considering any disparate treatment alleged by Plaintiff for two reasons: (1) Plaintiff's submissions failed to put Defendant on notice that his retaliation claim included disparate treatment allegations; and (2) Plaintiff has presented no facts supporting his allegation of disparate treatment. (Def.'s Reply at 10–11.) Plaintiff counters that: (1) his Complaint made clear that the adverse actions at issue included disparate treatment prior to the Performance Comments; and (2)

facts supporting the allegation of disparate treatment are included in Plaintiff's affidavit.  (Pl.'s Resp. at 11–14.)

I address only Defendant's second point, as I find Plaintiff has failed to proffer sufficient facts to allow a reasonable juror to conclude that Plaintiff was subject to the alleged disparate treatment.  As Defendant points out, Plaintiff does not provide a single example or date on which an incident reflecting these allegedly adverse actions occurred.  (*See* Def.'s Reply at 12–14.)   In fact, the only evidence supporting Plaintiff's claim of disparate retaliatory treatment is Plaintiff's Affidavit in which he states:

> [Wamboldt] became more critical of my work, and she took longer to review and clear my work.  For example, for some items that she previously cleared in [one] to [three] days, now took her weeks to clear.  Also, she spoke with me less.  Prior to this date, we would talk about personal matters as well as official matters.  After May 25, 2004, she talked with me less often.

(Pl.'s Resp., Ex. 6 at 3 [Pl.'s Aff.].)

Yet, to survive summary judgment, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing Fed. R. Civ. P. 56[e] [2006]).  Although in a summary judgment motion, this court is to resolve all factual issues in favor of the non-moving party, Plaintiff must aver specific facts in order to create a material factual issue.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  It is impermissible for this court to "assum[e] that general averments embrace the 'specific' facts need to sustain the complaint."  *Id.* (quoting Fed. R. Civ. P. 56[e] [2006]).  Here, Plaintiff has proffered only the conclusory allegations of his affidavit, devoid of specific facts, to support his

claim of disparate retaliatory treatment, which is insufficient to create a genuine issue of material

fact.[3]  *Id.* (stating a plaintiff may "not [] replace conclusory allegations of the complaint or answer

with conclusory allegations of an affidavit"); *Hall*, 935 F.2d at 1111 (noting that "conclusory and

self-serving affidavits" are not sufficient "[t]o come within the protection of [Rule 56(e)]").

Accordingly, Plaintiff is left to rest his retaliation claim solely on the October 2004 Performance

Comments attached to his performance evaluation.

### *(b)     Performance Comments*

Defendant argues that a lower than normal performance rating is not an adverse

employment action according to the caselaw of this and most other circuits, and the Supreme

Court's decision in *Burlington* should not alter this court's analysis.  (Def.'s Br. at 15–16.)  Even

if a reduced performance rating could be an adverse employment action, Defendant argues the

Performance Comments were not "materially adverse" to Plaintiff because the comments: (1)

were true; (2) had no significant effect on Plaintiff; (3) were not shown to anyone other than

Plaintiff and his supervisors; and (4) were ordinary workplace tribulations, insufficient to amount

to a "materially adverse" action.  (*Id.* at 6–9.)

Plaintiff, on the other hand, contends that Defendant's reliance on this circuit's pre-

*Burlington* retaliation cases is inappropriate.  (*See* Pl.'s Surreply at 4–5.)  Under *Burlington*,

---

[3]Plaintiff claims his perception of his employer's conduct is supported not only by his own affidavit, but by that of Anthony Tafoya, the EEO Manager for the Office of Oceanic and Atmospheric Research.  (Pl.'s Surreply at 8.)  Tafoya, however, makes explicit that his opinions regarding Plaintiff's case were based exclusively on talking to Plaintiff, and thus were not based on personal knowledge.  (*See id.*, Ex. 7 [Tafoya Dep.].)  Accordingly, Tafoya's testimony is wholly unpersuasive to this court.  *See Hall*, 935 F.2d at 1111.

Plaintiff argues, the Performance Comments would be materially adverse to a reasonable employee.  (Pl.'s Surreply at 7–9.)  Further, Plaintiff states that "[s]urely, if an employee is so upset by retaliatory conduct that he chooses to quit, rather than continue to collect a paycheck, the harm he experienced is sufficiently adverse to meet the threshold requirement for a retaliation claim."  (*Id.* at 7–8.)

At the outset, I find the Tenth Circuit cases relied upon by Defendant in its inital brief to show that lower than normal performance evaluations do not constitute retaliatory adverse actions are no longer apposite.  (*See* Def.'s Br. at 15.)  As Defendant admits, these cases are based on the notion that an "adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[4]  (*Id.* at 15. [quoting *Duncan*, 397 F.3d at 1300].)  In fact, the strict rule proposed by Defendant declaring that all performance evaluations are not adverse actions seems directly contrary to the standard laid out by the Court in *Burlington,* which explained that "[w]hether a particular [employer action] is materially adverse depends upon the circumstances of the particular case."  126 S. Ct. at 2415.  Thus, "[c]ontext matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships . . . .'"  *Id.* (quoting *Onacle v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 [1998]).  A strict rule that lower than normal performance

---

[4]The court also finds that none of the cases cited by Defendant from other circuits utilize the "reasonable employee" standard adopted by the Supreme Court in *Burlington*.  (*See id.* at 15–16.)

-17-

evaluations are not adverse actions for the purposes of a retaliation claim would short circuit the very inquiry into the totality of the circumstances that the Supreme Court has demanded this court undertake.  *See id.*

Thus, I must now ask whether a positive performance evaluation with negative comments[5] attached "would be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 2409.  Based on the circumstances of this particular case, I find the Performance Comments constitute a materially adverse action. Although one positive performance evaluation with negative comments attached during a more than two decade tenure may, at first blush, appear to be the type of "petty slights or minor annoyances" that cannot constitute a retaliatory adverse action under Title VII, the context of this performance evaluation reveals there is more at stake.  *Id.* at 2415.  At the time Wamboldt notified Plaintiff of the Performance Comments, she knew that Plaintiff planned to retire in December of 2004.  (Def.'s Br., Statement of Undisputed Facts ¶ 32; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 32.)  Because the comments were conveyed in October 2004, these comments were likely to be the last entry in Plaintiff's personnel file.  Thus, should

_____

[5]Although there is some disagreement over the issue, for the purposes of summary judgment, the Performance Comments can clearly be characterized as negative, in spite of the one paragraph caveat at the end of the comments expressing that the poor performance discussed in the comments are not typical of Plaintiff's past performance.  (*See* Def.'s Br., Ex. A–4 at 22–26 [Performance Comments].)  The introduction to the Performance Comments alone gives a sense of the tenor of the document: "I am concerned about the fundamental lack of action and judgment demonstrated by you regarding a performance case . . . ."  (*Id.*, Ex. A–4 at 22 [Performance Comments].)  Viewing the facts in the light most favorable to Plaintiff, I find the comments are negative in tone.

Plaintiff seek another job, which he in fact did, and should a prospective employer seek a reference from Defendant, it is these Performance Comments that could very well lead the prospective employer to conclude that, in spite of Plaintiff's many years of exemplary performance, either his skills or attitude had deteriorated in his final months on the job and perhaps led to Plaintiff's departure. (*See id.*, Ex. A–1 at 3 [Pl. Dep.].) If, on the other hand, Plaintiff had subsequent evaluations on file showing these negative comments as an anomaly, this court's analysis may have been different. Based on the foregoing, I find there is a genuine issue as to whether a reasonable juror could conclude that attaching the negative Performance Comments to Plaintiff's final performance evaluation was an action that a reasonable employee may well have found materially harmful.[6] *See Browne v. Potomac Elec. Power Co.*, No. 05-1177(RWR), 2006 U.S. Dist. LEXIS 45074, at * 9 (D.D.C. July 3, 2006) (quoting *Burlington*, 126 S. Ct. at 2415) (noting that "poor performance evaluations are not 'petty slights, minor annoyances, [or] simple lack of good manners[,]' but rather materially adverse actions that will support a claim of retaliation").

---

[6]Plaintiff's argument that because he was "so upset by [the] retaliatory conduct" that he chose to retire early, "the harm he experienced is sufficiently adverse to meet the threshold requirement for a retaliation claim," represents an obvious misreading of the *Burlington* standard. (*See* Pl.'s Surreply at 7–8.) The Supreme Court has mandated that the material adversity of an action be judged from the perspective of an *objectively* reasonable employee. 136 S. Ct. at 2415. Thus, the subjective reaction of Plaintiff is by no means dispositive on the issue.

### *(2)     Causal Connection*

To prove the third prong of his prima facie case, Plaintiff must show a causal connection between his protected opposition and Defendant's adverse action.  *Metzler*, 464 F.3d at 1171. Plaintiff attempts to do this in two ways, by showing: (1) temporal proximity between the protected opposition and the adverse action, and (2) additional circumstantial evidence of retaliatory motive.  (*See* Pl.'s Resp. at 21–25; Pl.'s Surreply at 9–1.)

The Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of causal connection sufficient to 'justify an inference of retaliatory motive.'"  *Id.* at 1171 (quoting *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1228 [10th Cir. 2006].)  However, temporal proximity alone may establish a causal connection "only if 'the termination is very closely connected in time with the protect activity.'" *Id.* (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 [10th Cir. 1999].)  Otherwise, "the plaintiff must rely on Additional evidence beyond temporal proximity to establish causation." *Anderson*, 181 F.3d at 1179 (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 [10th Cir. 1997]).  Here, Plaintiff argues that the appropriate date from which to consider temporal proximity is May 25, 2004, when Plaintiff told Wamboldt he would be taking an EEO deposition, because—according to Wamboldt—she had forgotten about the EEO complaint until that date. (Pl.'s Resp. at 21 [citing *id.*, Ex. A–5 at 4 (Wamboldt Dep.)].) Defendant counters that because Wamboldt first learned of Plaintiff's EEO activity in February of 2002, and did not write the Performance Comments until October of 2004, the two events were too remote in time to raise an inference of causal connection.  (Def.'s Br. at 20.)  Moreover, urges Defendant, even assuming

-20-

May 2004 as the relevant date, there was a five month lapse between that date and the Performance Comments, which is, standing alone, insufficient to establish causation. (Def.'s Reply at 15.)

Viewing the facts in the light most favorable to the non-moving party, as I must, I find the relevant date of Wamboldt's awareness of the EEO complaint for the purposes of determining temporal proximity is May 2004. Both parties agree that whatever Wamboldt knew about Plaintiff's complaint status in February 2002, when Plaintiff first informed Wamboldt that he would be speaking with an EEO counselor, she forgot about it until May 2004, when Plaintiff told her about his deposition. (Pl.'s Resp, Statement of Add'l Disputed Facts ¶ 7; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.) The period of time between the May 2004 protected opposition and the October 15, 2004 adverse action was in excess of four months, and in this circuit, "a three-month period, standing alone, is insufficient to establish causation." *Anderson*, 181 F.3d at 1179 (citing *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997). Accordingly, said time period is insufficient to establish causation without additional circumstantial evidence of retaliatory motive. *Id.* at 1179.

### (a)    *Additional Circumstantial Evidence of Causal Connection*

Plaintiff proffers the following additional circumstantial evidence of retaliatory motive: (1) Wamboldt's suggestion in the Performance Comments that she started noticing Plaintiff's performance issues in May 2004; (2) that Wamboldt coordinated with Purcell in reviewing and attaching the comments; (3) the possibility that Wamboldt might lose her job if Plaintiff's EEO

complaint was successful; (4) Plaintiff received positive ratings and a performance award for the first half of the rating period; and (5) that the Performance Comments were false. (Pl.'s Resp. at 21–25; Pl.'s Surreply at 9–11.)

Defendant counters that: (1) Wamboldt's comments do not support an inference that she noticed problems with Plaintiff's performance beginning in May 2004; (2) because the comments were written by Wamboldt, and not by someone who Plaintiff is accusing of discrimination, an inference of retaliatory motive is not justified; (3) there is no evidence that Wamboldt perceived herself as at risk of losing her job based on Plaintiff's EEO complaint; (4) Plaintiff's good rating and performance award prior to May 2004 are indicative only of the fact that his performance issues didn't begin until after May 2004, when he began working on the Employee K PIP; and (5) the Performance Comments are true and Plaintiff substantially admits to their veracity. (Def.'s Br. at 17–21.) I address each argument in turn.

Plaintiff's averment that the Performance Comments reflect that Wamboldt's criticism of Plaintiff began in May 2004 is wholly disingenuous. (See Def.'s Br. at 21; Pl.'s Resp. at 21–22.) Plaintiff points to three pieces of evidence to support his argument: (1) Wamboldt's statement that "'[Plaintiff] has been talking about this case in our team meetings for months (since May 2004);'" (2) Wamboldt's reference to a May 3, 2004 document, in which Wamboldt states: "I asked your back up for the employee's performance appraisal. The one you had in your case file contained no documentation of progress reviews (as mentioned in the document you had in your file named, '[Employee's] Midterm 04 GPWAS May 3rd 2004' nor was a final performance rating indicated;" and (3) Wamboldt supposed faulting of Plaintiff for starting the PIP process in

May 2004 by stating, "I personally met with your manager during a business trip to Fort Worth the week of October 3, 2004. . . . He [] informed me that he started the PIP process with you in May 2004 (I thought it was July 2004).  Taking over four months to complete this assignment is unacceptable . . . ."  (Pl.'s Resp. at 22–23 [citing Def.'s Br., Ex. A–4 at 22–25 [Performance Comments].)  This court fails to see how any of these statements suggest Wamboldt became critical of Plaintiff beginning in May 2004,[7] and mere recitation of the quotes does not aid the court in this endeavor.

Second, Plaintiff suggests that because Purcell, who was named in Plaintiff's EEO complaint, reviewed and approved Wamboldt's comments, an inference of retaliatory motive arises.  (Pl.'s Resp. at 22–23.)  This argument is meritless, as both parties agree that it was Wamboldt, not Purcell, who drafted the comments based on her experiences with Plaintiff.  (Pl.'s Resp., Statement of Add'l Disputed Facts ¶ 10; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.)  It is undisputed that Purcell, who had no direct supervisory contact with Plaintiff, simply reviewed and approved the comments.  (*Id.*, Statement of Add'l Disputed Facts ¶ 10; *admitted at* Def.'s Reply, Resp. to Statement of Add'l Disputed Facts.)  There is no allegation before the court that Purcell was the instigator behind the Performance Comments.  On these facts, Purcell's level of involvement with the comments does not raise an inference of retaliatory motive.

---

[7]Moreover, the second statement refers to a document dated before Plaintiff alleges Wamboldt was aware of his EEO complaint, and the third statement was critical not of Plaintiff's May 2004 work, but of his failure to complete an assignment began in May 2004 within four months.

Third, Plaintiff contends retaliatory motive can be inferred because Wamboldt, although not named directly in Plaintiff's EEO complaint, may have lost her job if the complaint was successful.  (Pl.'s Resp. at 23–24.)  Plaintiff cites Wamboldt's deposition when she responded "I guess" to the question of whether she recognizes the possibility that if Plaintiff were successful, she may lose her promotion, as proof that she was aware of such a possibility.  (*Id.* at 23 [citing *id.*, Ex. 4 at 3 (Wamboldt Dep.)].)  At no point was Wamboldt asked, nor did she testify that when she wrote the Performance Comments, she was aware she might lose her job if Plaintiff prevailed on his EEO complaint.  In fact, as Defendant points out, when Wamboldt was asked what would happen to her position if Plaintiff prevailed on his claims, she responded, "I don't know how they would handle that."  (Def.'s Br. at 17–18 [citing Pl.'s Resp., Ex. 4 at 3 [Wamboldt Dep.].)  Moreover, Wamboldt testified that she never spoke with anyone, including Purcell, about the possible consequences of Plaintiff prevailing in his EEO suit.  (Pl.'s Resp., Ex. 4 at 3 [Wamboldt Dep.].)  I find Wamboldt's response of "I guess" to be insufficient to establish a reasonable inference that she had a retaliatory motive, particularly considering her further testimony that she never spoke with anyone about such a possibility during the relevant period.

Fourth, Plaintiff argues that the nature of the Performance Comments shows Wamboldt's intentions were not to legitimately express management concerns, because Plaintiff received positive ratings and a performance award for the first six months of the same rating period.  (Pl.'s Resp. at 21–25.)  That Plaintiff received high marks during the first half of the rating period does not raise an inference that his receipt of negative comments in the second half of the rating period was motivated by retaliation.  This is particularly true when Wamboldt's comments clearly center

-24-

around a finite set of performance problems by Plaintiff involving largely one problematic PIP, which Plaintiff was working on primarily in the second half of the rating period.  (*See* Def.'s Br., Ex. A–4 at 22-26 [Performance Comments].)  As the Performance Comments make clear, "[Plaintiff's] inadequate performance in this area is not typical of [Plaintiff's] usual diligence to meeting [his] clients' needs and providing them with expert advice and guidance." (*Id.*, Ex. A–4 at 26 [Performance Comments].)  Thus, Plaintiff avers no specific facts that lead this court to doubt that Plaintiff's performance evaluation from the previous half of the rating period was stellar, because—at that point in time—Plaintiff had no performance problems.

Finally, Plaintiff argues that retaliatory motive can be inferred from the falsity of the Performance Comments.  (Pl.'s Resp. at 14; Def.'s Br., Ex. A–1 at 17 [Pl. Dep.] [stating the Performance Comments "were devious; full of guile; having no basis in the facts, the actual situation"].)  "'In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'"  *Metzler*, 464 F.3d at 1178 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 [2000]).[8]

---

[8]Although this evidence may seem more appropriate for consideration in the court's examination of pretext, it is also proper for consideration in assessing causal connection. *See Wells*, 325 F.3d at 1218 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 [3d Cir. 2000]) ("We understand that by considering an employer's proffered reasons for taking adverse action in the causal-connection portion of the prima facie case, we are assessing pretext evidence that is typically considered in a later phase of the *McDonnell Douglas* analysis.  But we agree

As Defendant points out, although Plaintiff generally avers that Wamboldt's comments were untrue, he admits to the veracity of many specific criticisms. (*See* Def.'s Br. at 21.)  The primary criticisms contained in the Performance Comments are that Plaintiff: (1) gave a severely flawed draft of the Employee K PIP to Wamboldt immediately before going on vacation; (2) allowed a notification letter to Employee K to be printed on NWS letterhead and to be sent to the employee without management review, in deviation from Defendant's policy; (3) used inappropriately apologetic terminology in the Employee K letter; (4) improperly approved issuance of an award to Employee K, even though he had a sub-par performance rating; and (5) inappropriately deferred to the judgment of Gordon and failed to provide him with sufficient guidance. (Def.'s Br., Ex. A–4 at 22–26 [Performance Comments].)  Importantly, Plaintiff admits the veracity of the bases of the majority of Wamboldt's criticism; yet, he argues any bad outcomes were not his responsibility.  He agrees with Wamboldt's view that the draft PIP was incomplete, poorly written, and included irrelevant and improper information.  (*See id.*, Ex. A–3 at 15–16 [Pl. Aff.].) Plaintiff also acknowledged that the Employee K letter was improperly put on NWS letterhead and sent to the employee before management review.  (*See id.*, Ex. A–3 at 14 [Pl. Aff.].)   Further, Plaintiff admits his letter to Employee K contained language conveying "that [NWS was] sorry that it was necessary to take the action."  *See id.*, Ex. A–1 at 13 [Pl. Dep.]

As to each of the above admissions, Plaintiff offers explanations for what may appear to be poor performance: (1) the Employee K PIP sent to Wamboldt was only intended to be a rough

---

with the Third Circuit that the evidence of pretext can be useful in multiple stages of a Title VII retaliation claim.").

draft, and was based on incomplete information from Gordon; (2) Plaintiff did not direct NWS to place the employee letter on NWS letterhead or to send the letter without management review; and (3) Plaintiff had used the apology language in past letters that had been approved by other supervisors.  (*See* Def.'s Br., Ex. A–3 at 14, 16 [Pl. Aff.], Ex. A–1 at 13 [Pl. Dep.].)

Even assuming the veracity of each of the above excuses, they do not lead to an inference that the criticism was untrue.  For instance, the Performance Comments suggest that  regardless of Plaintiff's intentions in turning in a very rough draft PIP, he should not have turned in such a draft.  As Wamboldt explained: "When you submit documents for my review, they should be in the form as a final draft that requires only minor modifications before submission to OGC (unless you specifically come to me for discussion and guidance)."  (Def.'s Br., Ex. A–4 at 24 [Performance Comments].)  Plaintiff admits he submitted a draft, and thus has failed to effectively challenge the veracity of this criticism.

Second, even assuming that Plaintiff did not direct NWS to put the employee letter on NWS letterhead and have it sent to Employee K without management review, Plaintiff nowhere alleges that it was not his responsibility, in passing the letter on to NWS, to ensure that the letter followed the proper course.  Wamboldt's comments strongly suggest that it was Plaintiff's responsibility to make the process clear to NWS or Gordon.  She stated: "I called the supervisor to ask why the employee had signed a draft letter, and he stated that you told him the employee needed to sign the letter and receive a copy of it.  This indicates to me that you did not make the process clear to [Gordon]."  (*Id.*, Ex. A–4 at 22 [Performance Comments].)  Plaintiff fails to

allege that it was not his responsibility to ensure proper processing of this letter; thus he has failed to effectively challenge the veracity of this criticism.

Third, even if it is true that Plaintiff had used the apologetic language included in the letter to Employee K in letters reviewed by past supervisors, Plaintiff fails to allege that Wamboldt's directive that Human Resources Advisors should not counsel managers to "apologize to an employee for his/her poor performance" was either improper or disparately applied. (*Id.*, Ex. A–4 at 23 [Performance Comments].)  On the contrary, Plaintiff admits in his deposition that it is inappropriate to apologize for lowering a performance rating.  (See Def.'s Br., Ex. A–1 at 12 [Pl. Dep.]).  Specifically, Plaintiff testified, "I don't even like to use the word 'apologize'—not saying that we were sorry that we were doing the action, but sorry that it was necessary to take the action."  (*Id.*)  Given this admission, the fact that another supervisor had permitted Plaintiff to use apologetic terminology does not give rise to an inference that Wamboldt's rejection of the language was improper.[9]

The only criticism Plaintiff seems to directly contest the veracity of Wamboldt's statement that on August 16, 2004 Plaintiff "authorized a performance award of the employee whose performance was rated unsatisfactory."  (Def.'s Br. , Ex. A–4 at 24 [Performance Comments].)  Plaintiff contends that on July 19, 2004, the time at which Gordon wanted to give Employee K a special act award, Employee K had a positive rating.  (*Id.*, Ex. A–3 at 15 [Pl. Aff.].)  On the

---

[9]Nor does it suggest disparate treatment.  Although a Plaintiff may certainly show disparate treatment by providing evidence that he was treated differently from other similarly-situated employees, such a comparison is only effective if the similarly situated employees had the same supervisor.  *See Metzler*, 464 F.3d at 1175.

record before the court, Defendant's policy as to when and whether an employee is to receive a performance award is unclear.  Regardless, Wamboldt's criticism of Plaintiff's handling of the award shows that whether his action violated a specific Defendant policy was secondary to her perception that Plaintiff's decision to give a performance award to an employee who was recognized as a poor performer reflected Plaintiff's poor judgment.  (*See id.*, Ex. A–4 at 24 [Performance Comments] [stating that giving this award "sends the wrong message to co-workers;" "giving a poor performer an award was inappropriate; "[there are] other ways [Gordon] could encourage the employee"].)  Plaintiff seems to disagree with Wamboldt's assessment; yet, his self-serving opinion that his decision to authorize the award was not made in poor judgment is simply insufficient to establish a genuine issue of material fact as to the veracity of Wamboldt's common-sense criticism.  (*Id.*, Ex. A–1 at 13 [Pl. Dep.].)  *See Hall*, 935 F.2d at 1111 (holding "conclusory and self-serving affidavits are not sufficient" to overcome a summary judgment motion).

Finally, as to Wamboldt's criticism that Plaintiff improperly deferred to Gordon and gave him insufficient guidance, Plaintiff addresses the criticism only insofar as he states he was unable to get necessary information from Gordon to allow Plaintiff to successfully write the Employee K PIP.  (*See* Def.'s Br., Ex. A–3 at 14–15 [Pl. Aff.].)  Plaintiff has thus averred insufficient facts to show he did in fact give sufficient guidance to Gordon.   Based on the foregoing, I find Plaintiff has failed to raise a genuine issue of material fact as to whether there is a causal connection between his protected activity and the negative Performance Comments.

### *(3)    Legitimate Business Reason and Pretext*

Even if I were to find that Plaintiff has met his prima facie burden, I find that he has failed to meets his burden at the next stage—showing pretext.  Plaintiff does not deny that Defendant has asserted a non-discriminatory reason for the negative Performance Comments—that they were true and intended to encourage Plaintiff to work on his performance and complete the Employee K PIP during his then remaining two months on the job.  (*See* Def.'s Br., Ex. A–5 at 3 [Wamboldt Dep.].)  Further, Defendant explains that retirements sometimes do not occur on their scheduled date, and, thus, there was a possibility that Plaintiff would remain in his job longer than expected.  (*See id.*, Ex. A–5 at 3 [Wamboldt Dep.].)  Because Defendant has articulated a legitimate, nondiscriminatory reason for the adverse action, the burden shifts back to Plaintiff to demonstrate that the reason advanced by Defendant is a pretext for unlawful discrimination. *Wells*, 325 F.3d at 1212.  Absent evidence of pretext, no reasonable inference of retaliatory motive arises.  *See Anderson*, 181 F.3d at 1179 ("Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.").

Plaintiff never directly addresses the issue of pretext until his surreply; yet, from his briefs, the court can discern two conceivable arguments to support a finding of pretext: (1) that Wamboldt's comments were untrue; (2) that placing the comments in his file could serve no legitimate purpose in light of his upcoming retirement.  (Pl.'s Resp. at 17; Pl.'s Surreply at 9–11.) I have already addressed Plaintiff's first argument and found Plaintiff pled insufficient facts to allow a reasonable juror to find the comments were false.  (*See Analysis* § 2(ii)(2)(b), *supra*.) Regarding Plaintiff's second point, Plaintiff claims that because Wamboldt knew he was retiring,

and because of the timing, both sides knew the Performance Comments would not be used in the future to improve his performance.  (Pl.'s Resp. at 17.)  Defendant counters that retirement is never guaranteed and that Plaintiff still had time left before retirement to complete the Employee K PIP.  (*See* Def.'s Br., Ex. A–5 at 3 [Wamboldt Dep.].)  Further, Defendant avers that Wamboldt wanted to convey the seriousness of the assignment and Plaintiff's failures in relation to it.  (*Id.*, Ex. A–5 at 2 [Wamboldt Dep.].)  Wamboldt explains, "[Plaintiff] was not taking responsibility to complete an assignment that was very important, and I felt that I needed to help him understand my concerns and why it was important for him to complete the assignment." (*Id.*, Ex. A–5 at 2 [Wamboldt Dep.].)  I find that Wamboldt had no special responsibility to Plaintiff simply because he was retiring to abstain from including truthful criticism in Plaintiff's final performance evaluation.  Her decision to include the comments simply does not support a finding of pretext.

Even if Wamboldt was sure Plaintiff was going to retire, it seems to this court more than plausible that she would want to convey Plaintiff's poor performance in his final appraisal period, and hope that there may be a turn-around in the last few months of Plaintiff's tenure.  As Wamboldt stated in the Performance Comments: "I expect that [Plaintiff] will continue to work together with me to get all [Plaintiff's] work assignments completed timely and accurately." (*Id.*, Ex. A–4 at 26 [Performance Comments].)  Plaintiff's mere speculation to the contrary cannot serve to prove pretext.  *Webb v. Communs., L.L.C.*, 167 F. App'x 725, 733 (10th Cir. 2006) (stating "allegations . . . based purely upon speculation . . . [are] insufficient to raise a genuine issue of material fact as to pretext").  Based on the foregoing, I find Plaintiff has failed to carry his

burden of averring sufficient facts to permit a reasonable juror to find Defendant's asserted reason for its adverse action was pretextual.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

*3.*     ***Conclusion***

Based on the foregoing it is therefore ORDERED as follows:

1.      Defendant's motion for partial summary judgment (#26) is GRANTED.

2.      The court will hold a Final Pretrial Conference commencing at **9:30 o'clock a.m.** on Friday, **January 12, 2007**, in Courtroom A1001 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at http://www.co.uscourts.gov/forms/ewn_fin_pre_ord.wpd.  These specific web addresses should be used to insure that the proper format is observed.

Dated this 6th day of December, 2006.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge